THE STATE, EX REL. THE OMAHA NATIONAL BANK v. JOSEPH C. McBRIDE, STATE TREASURER.

1. **Constitutional Law.** Section 22, Art. III, and Section 8, Art. IX, of the constitution were designed to effect two different and distinct objects—the one to establish a permanent rule in regard to future expenditures of the state, and the other to ascertain, determine, and provide by law, for the payment of the existent state debt.

2. ———: FUNDING STATE INDEBTEDNESS. The funding act of February 14, 1877, requires the several classes of state indebtedness therein specified to be paid, without conditions or abatement, upon presentation of the warrants or certificates of indebtedness to the treasurer for payment.

3. ———: DUTIES OF AUDITOR OF PUBLIC ACCOUNTS. The state auditor had no authority to audit, adjust, or draw warrants, or make orders in respect of any part of the indebtedness specified in said act.

THIS was an original application for a mandamus to compel payment by the treasurer of the balance claimed to be due the relator on certificates of indebtedness issued by the inspectors of the state penitentiary, in

pursuance of law, to the contractor for the building of the penitentiary, and by him assigned and transferred to the relator. The total amount held by the relator was $39,507.66. The treasurer, under the provisions of the act of 1877, Laws, 1877, p. 120, paid the sum of $37,467.09, leaving a balance of the principal still unpaid of the sum of $2,041.57. These certificates had been issued between April and November, 1876, as the work of building the penitentiary had progressed, and as the contractor, under his contract, was entitled to his pay. No appropriation having been made by the legislature for the payment of the sums represented in these certificates, warrants had not been issued. The treasurer refused to pay the above balance, because it was claimed by the auditor of public accounts that the contractor was indebted to the state for convict labor for the months of June, July, August, September, and October, 1876. The treasurer refused to pay interest to the relator upon the sum paid it. The relief demanded was the payment of balance, $2,041.57, with the interest on the whole amount of the certificates from April 7 to April 28, 1877, and interest upon the balance due, since April 28, 1877.

*G. W. Ambrose*, for the relator.

The certificates upon which the claim of the relator is based being a valid indebtedness against the state, the legislature funded them with all other known and valid claims. The preamble of the act recites the fact of their issuance, the laws under which they were issued, the numbers, amounts, and dates of each; also the fact of an excess of interest in two of them, provides for its deduction before payment, and finds—" the total amount due on said certificates being the sum of $76.233.97." Section one of the act, after providing for issuing and sale

of bonds to pay this, as well as the other funded indebtedness mentioned in the act, uses this language: " Upon the sale of said bonds, if the bid of any person *holding* any of such warrants or certificates of indebtedness be accepted, the said warrants or certificates *shall be received* by the treasurer in exchange for said bonds." Holders of these warrants and certificates were by the express terms of this law made preferred bidders, and if bidding, the law is mandatory that the class of indebtedness held by the bidder *should* be received by the treasurer in exchange for the bonds, dollar for dollar; not that a deduction might be made by the treasurer or some other party unknown to this law.   The legislature was the final arbiter of the amount due.   The constitution, in vesting them with authority to " fund the indebtedness of the state," made them such.   The act finds the total amount due upon each class of warrants and certificates, in consequence of payments and excessive computation of interest (pages 121 and 122), provides for the issuance of bonds for the exact amount of the aggregate debt, and after fixing the date for the sale of the bonds, says: "And thereupon it shall be the duty of the said treasurer to pay *all* of said warrants and certificates, together with interest thereon, as herein provided, out of the sales of said bonds when presented to him for payment."   No discretion is left in anybody to pay part, nor deduct any sum which under some prior law might have been a proper deduction, but the command of the law was to pay *all*, with interest.

In performing the duty imposed upon them by the constitution, the legislature passed the " funding act." This is a solemn adjudication upon what the legislature deemed a valid indebtedness.   If the later law upon the subject has pronounced a different rule from the former one for payment of the debts of the state, or for the guidance of the officers in making that payment, the last

.statute controls. *Harrington v. Trustees*, 10 Wend., 547. *Inst. v. Commonwealth*, 14 B. Mon., 266. *Packer v. Sundbury & Erie R. R. Co.*, 19 Pa. St., 211. *Pease v. Whitney*, 5 Mass., 382. *Bank v. Commonwealth*, 26 Pa. St., 446. *State v. Bishop*, 41 Mo., 16. *Kendall v. U. S.*, 12 Pet., 604.

The state is subject to the law of estoppel as well as an individual. 3 Pick., 224. 7 Cal., 527. 4 Pet., 87. Ohio State, 319. It is an undisputed fact that the relator purchased these certificates for full value upon the day of the approval of this law. Good faith upon the part of the relator cannot be questioned. But, says the respondent, these certificates not being negotiable there can be no good faith on the part of the purchaser so as to prevent the state from making any defense it may have. This may be true in the abstract. But it is not necessary to an estoppel that the party against whom the principle invoked should design to mislead. If the act was calculated to mislead, and actually did mislead another, acting upon it in good faith, and exercising reasonable diligence under all circumstances, that is enough. *Manufacturers' Bank v. Hazard*, 30 N. Y., 226. *Cowles v. Bacon*, 21 Conn., 451. *Preston v. Mann*, 25 Conn., 118. *Copeland v. Copeland*, 28 Me., 525. *Taylor v. Zepp*, 14 Mo., 482. *Commonwealth v. Moltz*, 10 Pa. St., 527. *Eldrid v. Hazlett*, 33 Pa. St., 307. *Martin v. Righter*, 10 N. J. (Eq.), 516. *Williams v. Jackson*, 28 Ind., 334. *Weters' Appeal*, 35 Pa. St., 523.

*George H. Roberts, Attorney General*, and *T. M. Marquett*, for the respondent.

These certificates of the estimates of inspectors are not negotiable, so that the state can offset against the same any claim she may have. Dillon's Mun. Corp., 406.

Floyd. Acceptances, 7 Wall, 666. *People v. Gray*, 23 Cal., 125. *Comm'rs v. Keller*, 6 Kan., 511. *Comm'rs v. Day*, 19 Ind., 450. The law makes the convict labor an offset to what is due to the contractor on the estimate of the inspectors, and the amount of convict labor is to be deducted from the certificates of indebtedness. Act of Feb. 24, 1875, Laws 1875, 128. There is no law to allow interest on certificates of indebtedness. *Comm'rs v. Carter*, 2 Kan., 115. *Hull v. County*, 12 Iowa, 142. *Goodnow v. Comm'rs*, 11 Minn., 31.

The interest on certificates of indebtedness referred to in the act of February, 1877, is for school certificates. By law, the school fund certificates draw interest. But the certificates of indebtedness in question do not draw interest. See act of 1875, page 129. The act of February 14th, 1877 (see page 120), provides for interest on all except the certificates of indebtedness, certified by the prison inspectors, and that by law. All other indebtedness referred to in said act bears interest except said certificates.

The funding of the certificates of indebtedness makes a contract between the state and creditor binding alike on creditor and state. *People v. Bond,* 10 Cal., 569. *People v. Woods*, 7 Cal., 584.

The right of the state to have the convict labor offset against the amount due on said certificates of indebtedness is a vested one, and the legislature could not deprive the state of that right by repealing the law. By leasing the convict labor, W. H. B. Stout accepted the terms of the act of February 24th, 1875, and the right of the state to have convict labor offset against the amount due the contractor for each month, became a part of the contract between the state and the contractor. So all that was due the contractor upon his contract was the amount due the state for convict labor. To allow the contractor more than this would be in violation of sec-

tion sixteen of article III of the constitution. *Carpenter v. State*, 39 Wis., 280. The relator, by the assignment, took the said certificates subject to all the offsets the state might have. It was not the duty of the legislature to deduct the convict labor from the certificates of indebtedness. Its duty ended when they made an appropriation to pay the same. But it was the duty of the auditor to make this deduction, and he has performed it. The question of whether the convict labor should be deducted was not before the legislature. *State v. Treasurer*, 51 Mo., 23. *Rawson v. Rawson*, 59 Ill., 68.

GANTT, J.

An alternative writ of mandamus was allowed in this case. The cause was tried before the court upon the alternative writ, the answer thereto, and facts admitted by stipulation of the parties.

It appears that prior to and during the year 1866, W. H. B. Stout was contractor for building the state penitentiary, and that during the months of April, July, September, October, and November, 1866, the inspectors of the penitentiary issued to him, for work done under the contract, certificates of indebtedness, numbered 162, 177, 181, 192, 197, 198, and 204, amounting in the aggregate to the sum of $39,507.96; that afterwards the Omaha National Bank, the relator, purchased all said certificates, and became the owner and holder of them; that under the act of February 14, 1877, providing for the funding of all outstanding indebtedness of the state, the relator presented said certificates to the respondent for payment, who paid thereon the sum of $37,466.09, leaving a balance unpaid of $2,041.87, which, upon demand for payment thereof by the relator, he refused to pay. This refusal to pay is based upon an order of the state auditor directing the respondent to retain said balance

upon monthly estimates made by the warden of the penitentiary for prison labor let to said W. H. B. Stout.

The respondent contends that under the provisions of the second section of the act of February 25, 1875, the auditor shall retain from the fund appropriated to the contractor the amount of such estimates for prison labor, and that this order from the auditor is, in law, a sufficient justification for the refusal to pay the amount so retained. On the contrary, the relator insists that under the act of February 14, 1877, the state auditor has no authority to make such order in respect of the certificates in question in this case, and the relator is legally entitled to the full amount of the same.

The decision of the question raised by this controversy depends alone upon the interpretation of section 22, Art. III., and section 8, Art. IX, of the constitution, and the funding act of 1877, and acts relating to the erection and revenues of the state penitentiary.

There is a seeming conflict between the two sections of the constitution, but if they shall be expounded according to the purposes for which they were severally designed and adopted, this apparent conflict will be removed.

Section 22, Art. III, declares that " no money shall be drawn from the treasury except in pursuance of a specific appropriation made by law, and on presentation of a warrant issued by the auditor thereon; " and section 8, Art. IX, declares that " the *legislature* at its first session shall provide a law for the funding of all outstanding warrants and *other indebtedness* of the state, at a rate of interest not exceeding eight per cent. per annum." The former establishes a permanent rule in regard to the mode in which all future disbursements of the public funds and revenues shall be made. It requires a specific appropriation made by law, and the presentation of a warrant issued by the auditor, to authorize the payment

of money by the treasurer.   The latter relates exclusively to the existent indebtedness of the state at the time, and declares that " the *legislature* at its first session shall provide a law for the funding " of this debt, including both " outstanding warrants and *other indebtedness* of the state."

It is clear that the sole and only object of this section was to provide for the payment of the outstanding state debt whatever might be the nature and character of the same, and the execution of this one object exhausts the power conferred by the section.

There is no limitation to warrants only issued by the auditor, nor does the language employed, either by express terms or necessary implication, require any act to be done by the auditor in the completion of this one object; but on the contrary, from the fact that not only the outstanding warrants but all other indebtedness of the state must be included in the law, it seems that the *legislature* alone must, under the power conferred, ascertain and determine the outstanding indebtedness whatever might be its character, and provide the fund to pay and the mode of payment of the same.

It is therefore very clear that these two sections of the constitution were designed to accomplish two different and distinct purposes—the one to establish a permanent rule in regard to the future payments of expenditures of the state, and the other to ascertain, determine, and provide by law for the payment of the existent state debt.   This interpretation removes all apparent conflict between the two sections, and gives full force and effect to both, without conflict.

Now by the provisions of section ten of the act of March 4, 1870, as the work progressed on the penitentiary, the inspectors were required to " certify to the auditor of state the value of the work done on the building at the time, and on such certified statement the au-

35

ditor shall issue a warrant on the state treasurer for a sum not exceeding ninety per cent. of the value of the work so certified to have been done;" and section thirty-five provides that the revenue derived from convict labor, etc., "shall be paid to the warden and by him paid into the state treasury." This policy was continued by acts of March 10, 1871 and February 23, 1875, and the revenues collected by the warden and paid into the treasury were held "as a fund for the care and support of state prisoners."

But the second section of the act of February 25, 1875, provides " that hereafter the auditor of state shall. retain from the fund appropriated to the contractor of the state penitentiary the amount of each monthly estimate due for prison labor to the state from said contractor," and transfer the same to the penitentiary fund.

What the legislative intent was in passing the two latter acts so nearly at the same time, and so repugnant to each other, or whether that of February 25 infringes the contract with W. H. B. Stout, it is not essentially necessary now to inquire. For the new constitution adopted by the people took effect on the first day of November, 1875, and according to the interpretation given to section 22, Art. III, and section 8, Art. IX, of this constitution, the act of February 14, 1877, passed in pursuance of the latter section, must govern in respect to the payment of the existent indebtedness of the state.

This act is entitled, " An act to provide for the funding of all outstanding warrants and other indebtedness of the state." The preamble which immediately follows the title, sets forth that: " Whereas the state of Nebraska is indebted in divers sums on outstanding warrants and other forms of indebtedness as follows, to-wit:" and then follows itemized statements of four distinct classes of state indebtedness—the fourth class being " certificates

of indebtedness issued by the inspectors of the penitentiary on balance due upon the contract for the building of the penitentiary, and other expenses connected therewith." Then section one provides " for the purpose of funding the *foregoing* indebtedness," that state bonds shall be issued and sold under certain regulations prescribed, and that " persons or corporations *owning* any of said warrants or certificates of indebtedness may be bidders therefor," and " upon the sale of said bonds, if the bid of any person *holding* any such warrants or certificates of indebtedness be accepted, the said warrants or certificates shall be received by the treasurer in exchange for said bonds;" and provides further that "*it shall be the duty of said treasurer to pay all such warrants and certificates,* together with the interest thereon * * * out of the sales of the said bonds when presented to him for payment." It is quite clear from the terms here employed in the act that the four classes of indebtedness ascertained, specified, and itemized, were considered and determined by the legislature as absolute indebtedness of the state, to be paid upon presentation of the warrant or certificate to the treasurer, without any condition or abatement whatever. It authorizes and directs the money to be paid, not to the person to whom the warrants and certificates were issued, but to be paid to the persons and corporations *owning* and *holding* them.

Therefore, when the question in controversy in this case is viewed in the light of the constitutional provision and the positive provisions of the act of 1877, it seems clear that the auditor has no authority to audit, adjust, or draw warrants, or make any orders in respect of any part of the indebtedness specified in this act; and that his order to the treasurer directing him to deduct and retain from the amount of the certificates in question, the sum of $2,041.87, is a nullity, and constitutes no justification for the refusal to pay the money.

It must not, however, be inferred from the exposition of the law of this case, that the act of February 14, 1877, does, either in express terms or by necessary implication, repeal any of the prior acts referred to; it merely provides the fund for and the mode of payment of the state debt existing at the time, and when this is accomplished, the legislative authority conferred by section 8, Art. IX, of the constitution is exhausted. Hence, the act effects this one object only, and does not affect the operation of prior laws relating to the revenues accruing thereafter from convict labor.

Again, the act makes it the duty of the treasurer "to pay the warrants and *certificates* with interest thereon, as herein provided, * * * provided that all interest shall cease on any of said warrants or *certificates*, if not presented for payment on or before the first day of May, 1877." This language seems to admit of only this construction, namely: that when either warrants or certificates are presented for payment before the time mentioned, and not paid, then interest shall be paid thereon, but if not so presented, then interest thereon shall cease. The legislature deemed it proper to allow interest on the certificates of indebtedness in question, and it is the duty of the court to expound the law as it finds it, when not subversive of the constitution. Therefore, the peremptory writ of mandamus is granted to compel the payment of the balance of $2,041.87, together with interest thereon.

WRIT GRANTED.